Our final argument for this morning is number 231730, Centripetal Networks against Palo Alto Networks. Mr. Hanna, welcome back. Yes, thank you again, your honors. May it please the court. So the primary issue in this case is also claim construction. We do have some other issues to discuss, but the primary one is the lack of claim construction by the board of the term a malicious host tracker service. And I think it helps, in the other case we were talking about how we do this recovery from an attack. This patent is really about a fundamental shift in cyber security. So traditional cyber security would focus on the what. What we mean by that in our briefing is if you get a bad file or something that's malicious, that looks like it's going to do something bad to infect your computer, you block that file. What Centripetal recognized is that you're going to get a ton of bad files. The way the internet is growing, the way the attacks are being submitted to everyone, it's impossible to constantly block the what. So they decided, let's come up with a solution that blocks the who. Identifies who is the bad actor that's actually sending these files. Who are these malicious hosts? And by doing that, by blocking the who, you're able to block threats that you may never ever see coming before they ever infect your network. And what the board did here in this case is they did not give any patentable weight to the who. To the malicious host tracking service. When you talk about the who, in the claim, what is your best word for telling who? It's the word host, right? The malicious host, correct. So it says, this claim says that there's malicious traffic information received from a malicious host tracker service. And you want us to understand that the term malicious tracker information means the who. Because the thing that's sending it has the word host in it. So the, I think that we're on the same page, but I think you left out the word host. Yes, I think you said it. It says a malicious host tracker service is going to send malicious traffic information. And you want us to interpret malicious traffic information to say who, just because the information's coming from something that's called a malicious host tracker service, right? Do I have your? I think so, Your Honor. Okay. Just the argument is that the malicious host tracker information, or the service, that has to provide information about the hosts, the malicious hosts. That's the natural reading of the claim. The claim then say, you know, sending malicious host information, or identifying hosts of malicious traffic information. Why doesn't it say that if that's what's meant? It's a pretty broad claim. It just says sending malicious traffic information. But it also, but it does specify it, where that's received from. It's received from a host tracker service. You're saying it is necessarily so, as always, that a malicious host tracker service can only send identification of who? Of the hosts. Absolutely, Your Honor. That it has to contain identifying information of the hosts. That's the whole point of this, is that it will... Where does your specification say that? So the specification, it's throughout our briefing, but it specifically points out that they have these services in which they will identify various hosts that are going to be... that are going to be sending a variety of malicious... Is the word malicious host tracker service, that that's in the spec, right? I believe so, yes, Your Honor. I think it's pointed out in our briefing as well. Is there any place where it says a malicious host tracker service can only send identification of host? I don't think, no, it says the word only, but the... I'm sorry, isn't that absolutely crucial? I think it's... A service may be called that if it does a particular thing, but it may do other things as well. But it must... That's the point, is the board needed to construe this term so we even know what the bounds are. We never even got a construction of malicious host tracker information at all. So this goes to more of a fundamental principle that the board knew that this was a point of dispute, as we can all see, and the board sidestepped its obligation to define what a malicious host tracker service is. Don't you think that... Don't you think they had an implicit construction at least? No, I don't. Because if you look at it on page 10, this is appendix page 10, they said... Didn't they say plain and ordinary meaning? I can't remember. There's a lot of cases today. Can you remind me exactly what they said? No. So what they said was there's no reason to identify host. The malicious host tracker service does not have to identify host. That's what they said. They didn't say plain and ordinary meaning. They said it doesn't have to identify host. So it doesn't, for this claim, have to send host identifying information. Those are two different things. They said they do not have to identify host. Who is to say that? In the appendix at page 10. And then they go on to argue... I'm sorry, this seems important to me, so can you point me to the sentence that you're relying on? I think I have my notes on the other one, Your Honor. Yes, on pages 9 through 10. Appendix 9 through 10. So what they said specifically is, on the bottom of 9, they said that what our argument was that we pose limitations on the claimed malicious traffic information provided from a malicious host traffic service. And then on page 10, they said that Petitioner urges us to reject their argument. And then it said that it's going to not construe the term. And then we get to... malicious host tracker service, the host part. I guess I'm having trouble finding here where the board says anything other than the malicious traffic information, which is the thing that is being sent, doesn't have to be information about the identity of a malicious traffic host.  That's our point, Your Honor. The point is they defined the malicious traffic information. They did not define what a malicious host tracker service is or what's required from that. But in identifying what the malicious host traffic information is, it addressed your argument that that information should be limited based on what was sending it. So, Your Honor, they didn't say the host traffic information. They said there's two separate elements here. Malicious traffic information, right? And then we said we need a definition. They gave us a definition of that. We said, okay, what is the malicious host tracker service that's providing that? I guess I took it that the board was saying it doesn't matter what the malicious host tracker service is, except that we will assume that, as you suggest, it must track malicious hosts. The only thing that matters is what the malicious traffic information is, and that's not limited to the identity of the malicious host. So, Your Honor, I think there's a couple things there. They never clarified whether the malicious traffic information has to identify hosts or not. They did. They rejected it on pages 9 and 10. What they said was the malicious traffic information is not going to be limited to hosts. So that's a claim construction. Right, for malicious traffic information. But the malicious host tracker service... It can send both host information and other malicious traffic information. That's what the board is saying, and you're saying somehow that host tracker can only send host information. But that's not what that term in its plain meaning means when you say malicious traffic information. If you admit it only sent malicious host information, you would have said malicious host, not malicious traffic. So I think the problem, Your Honor, is that they still need to provide context in terms of the malicious... No, they don't. Is there any dispute, really, that a malicious host tracker service could send both host information and other malicious traffic information? I think there is a dispute. I think that you need to identify hosts as part of that information from a host tracker service. That's completely inconsistent with the plain language of malicious traffic information, and I don't see anywhere where malicious host tracker service is confined to only sending host information. It's talking about a malicious host, and a tracker service that tracks that host. You can probably figure out it's a malicious host by both the identity of the host and also the type of information it sends. That seems a much more natural reading in the reading the board came up with than what you're proposing. So that's looking at it in isolation, respectfully, Your Honor. That's looking at it in isolation. I'm looking at the plain language. That's what we start with, right? Right, right. And the plain language always says malicious traffic information received from a malicious host tracker service. That's what it always says when it talks about the malicious traffic information. That doesn't help you. Well, Your Honor... That's what a malicious host tracker service does. That's the point of the malicious host tracker service. And that's why they needed to construe that so we actually know what the bounds are. And the problem is they said that they were going to do it. On page 10, or appendix page 10 and 11, they said we're going to, in one instance, we're saying that malicious information doesn't have to contain host information. They said, okay, even then we're going to apply the patent owner's construction. And they never did so. They have one line saying that they're going to do it, and then you look at 25 through 30 of the appendix, and they never identify anywhere that has host information identified. And that's one of the cruxes of this patent. This patent is identifying the hosts so that you have the protection. And you cannot, and the board erred in that. But there's a separate ground. Let's look at the fact that the board applied the claims wrong. We pointed this out in our brief. The claims require this malicious traffic information, however Your Honors want to construe it, right, is received by a server. In their decision, they said the junk reference receives it at the gateway. That's not what the claims say. That's an independent ground for reversal. They got the facts wrong. The way that you apply the, that is exactly what they said. And even the petitioner pointed that out in its briefing that the board could have been more clear. Well, the board didn't get it right. They said that the malicious traffic information, this is what the board said, malicious traffic information goes to the gateway. The claims say the malicious traffic information goes to the server. They got it wrong. That's an independent ground for reversal. And finally is the. . . I'll just say the spoofed information. They pointed to spoofed IP addresses. We laid this out in our briefing. They said that that's the malicious traffic information. That hides where the origin is from rather than identify it. I'll reserve the rest of my time. Thank you. Mr. Howard.  May it please the Court. As in the last appeal, we think we can, when the Court can affirm on claim construction or on the basis of the factual findings that the board made in this IPR on this record or on the basis of collateral shopper, any of those three. But since most of the argument this morning has been about claim construction, I'd like to start there. As Your Honor's questions have indicated, the claims do not limit the nature of the malicious traffic information that is transferred from the malicious host tracker. And that was critical to their argument that you did not disclose. And that is what the board rejected on page 10 of the appendix. It says claim one does not recite the specifics of the malicious traffic information that the SPMS receives from the host tracker service. That's what they needed to show, that there's some limitation on the nature of the information that is sent to the SPMS and there's nothing in the claim to support that. And then they said, thus we agree with Petitioner that the independent claims are not limited to the packet identification features that patent owner asserts. So all that the board was rejecting about the proposed construction that Centripetal had offered was that the service identifies, that is not required, and provides identifying information, that is not required, about information about network hosts that have been determined to be associated with malicious network traffic. All that the board did was resolve the specific claim construction dispute that the parties had joined before that. That was all they needed to do. And that claim construction was moreover supported by the specification, not undermined by it. It's supported in particular by two different columns in the specification. At columns 11 to 12, and this is cited by the board at page 10, it notes that the specification discloses the type of information that might be the basis of filtering rules and that, quote, associated network addresses was just one example of the list. But also on column 15, which is the column that was just cited by Centripetal, there as well on column 15, it says that the malicious host tracker service may aggregate information associated with malicious network traffic and updates received from malicious host tracker service may include one or more network addresses. It's may. Of course, there's no question, Judge Hughes is your honor, this question indicated that IP addresses may be one of the types of information that would be shared. But it's not the only kind of information that might be shared. In fact, counsel's last comment about spoofed addresses I think proves the point. If the spoofed address is what has been associated with malicious traffic, then what one wants to know is the spoofed address, not the actual address of the actual host. Because that's not known. The spoofed address is what's going to be used. And so the system does not limit to the actual identifying information about the host. It's rather broad enough to encompass whatever that useful type of malicious trafficking information might be. Can I ask, what was the component of, is it Junk? Junk. Junk. That you mapped the malicious host traffic service onto? Well, your honor, it could be the third party virus watch service that Judge Hughes describes. Or the edge server. So the external device is the SPMS. The SPMS is what updates the rules and supplies the rules to the packet security gateway. That's the edge server. The edge server is the gateway that applies the rules. The SPMS that updates the rules and supplies the rules is the external device. And the board was clear in finding. I'm sorry, which component of Junk did you map this malicious host, malicious traffic host service, malicious host tracker service to? This would be to such a third, an external third party service such as, and you expressly disclosed a virus watch service. But our expert explained that those were well known to provide such information as IP addresses. And this goes then to the point that. This is all just, I just wanted to talk about the thing that was at issue. Put aside the malicious traffic information. I want to completely forget about that right now. Okay. What did you establish? And did the other side contest that the thing you said in your mapping was the malicious host tracker service? Did, among other things, track malicious hosts? Your Honor. Or track the hosts of malicious traffic? I don't think that they dispute that if it doesn't have to be identifying, but rather be information associated with malicious hosts, that Junk discloses that. So if we take out that identifying limitation. That part is not disputed. I don't think they're contesting it on the board's construction. The dispute is what the information is that constitutes the malicious traffic information that is being sent by this host. Yes, Your Honor. But if it is easier simply to affirm on the basis of the fact that the board specifically found on the record in this case, and in another case that is now final and therefore binding under collateral estoppel, that Junk discloses, among other things, the provision of IP addresses associated with malicious hosts and updating that list as a form of updated rules. So that's specifically found by the board on Appendix 27. And where is the thing in Junk that does that? Is that the edge server? The edge server applies the rule. The external device is what actually updates the rules, receiving information from this third-party service. And that's clear. The board goes through its mapping when it describes Junk at pages 15 to 16. And it goes through Figure 6. I think one of the confusing things here is that Figure 6 and Figure 7 use slightly different terminology, even though in some ways Figure 7 is just drilling down and giving more detail about Figure 6. So Figure 6 uses the term edge server as the security gateway. This is applying the rules. And it draws a line to the external world that would be the source of identifying the malicious code. In greater detail in Figure 7, that edge server is also in blue. It's the packet interceptor adapter, and it has a number of subcomponents to that. And the SPMS, which is what's gathering this information and turning it into rules, is what's in purple there. These are the external devices. And in one place on page 29, it's in purple notes that the board says that the edge server receives this information from the malicious host tracker information. And it does, but it does via the SPMS the external devices, which are what take that information and turn it into rules. And that is clear from other findings that the board makes. They were just skipping over a step there. On appendix 24, the board says, MOOC discloses edge server 602 receives management policies from a device external to the protected network in the same manner that the claimed PSG is associated with the SPMS of the recited preamble. So we know that that's the relationship. The edge server is the PSG. The external device is the SPMS. There are also other instances where they say that. The rules are defined and modified dynamically by an external device. So it's the external device interface. That's the SPMS. That's what's updating the rules, and it's applying them to the edge server. Again, on page 29, they simply sort of skipped that step. And that's, I think, maybe because figure six describes it without that step in between. We know that step exists because figure seven makes that clear. If I could, about the support for the actual finding that the board made, that among the types of malicious traffic information that are communicated and ultimately made into rules and applied by the edge server are internet IP addresses associated with malicious hosts. That's on appendix 26 to 27, where it says, as petitioner points out, so it's agreeing with us, group discloses receiving the rules and taking actions based on comparing the packets to predefined values, e.g., checking a received packet's source IP address against a list of blocked addresses and responding accordingly. So addresses, blocked addresses, are an example of the rules that the board understands and discloses the edge server applying. And it cites for that proposition petition 40 to 41. And at petition 40 to 41, we go into great detail how that occurs and cite, in addition to other things, our experts' disclosure, Mattacetti, at paragraphs 265 to 269. And among the other things that are disclosed at petition 40 to 41 and explained further by Mr. Mattacetti is that UIC, on paragraphs 176 to 177, and that's at appendix 2737, expressly discloses, quote, checking the source IP address of the packet against a blocked list of IP addresses. So of course UIC isn't ignorant of the idea that one of the ways that one can identify malicious hosts and block them is through IP addresses. And further, UIC discloses, and this is at paragraph 111 at appendix 2728, that the edge servers can obtain information, and we know that it goes here through the intermediary of the SPMS, these external devices, from a virus watch service. Mattacetti, and this is appendix 1365 to 66, explains that it would have been obvious for one who's knowledgeable of the art that UIC's external devices would automatically update rules such as blocked IP addresses with additional blocked IP addresses provided by this third-party service because, of course, it was well known that once the malicious host knows that it's been identified, it changes its IP address, and that list of IP addresses has to be constantly updated. So the board makes a specific finding that UIC discloses to one knowledgeable in the art that among the types of malicious traffic information that the malicious host tracker would provide are IP addresses associated with suspicious hosts, and that those would be blocked. They also make a specific finding that those would be updated automatically. Appendix 32, speaking specifically of lists of blocked IP addresses, it notes the fact that the set of rules is updated, and then appendix 34, that the SPMS discloses that the resetting of the rules is performed automatically. All of these findings, in fact, are made and all are supported, but you don't have to decide based upon the record and findings here because in an earlier proceeding, the board found, and it was not appealed, and this court affirmed the board's findings that UIC discloses what claim 14 of the 205 patent expressly required. What it required was receiving from a subscription service that aggregates information associated with malicious network traffic a list of network addresses known to be associated with malicious network traffic. That was what was required by the claim 14 of the 205 patent, and that is what was held to be disclosed by UIC. So there's no question that network addresses known to be associated with malicious hosts is the kind of identifying information that they say needs to be disclosed, and it was found to be disclosed there. We have on page 41 of our red brief the mapping to what Centribunal says is required. It's word for word. So on any of those grounds, Your Honors, you could affirm. Thank you so much. Thank you. Your Honors, I want to touch on this point that counsel kept saying that the board skipped this step. With all due respect, the board can't skip a step. On claim one, on appendix 96, it says the claim requires that the security policy management server receives malicious traffic information from a malicious host tracker service. In the board's mapping on appendix 27, they said, we find that Junk discloses a packet security gateway that receives malicious traffic information from a malicious host tracking service. They mapped it to the wrong. The finding is inconsistent with the claims. The claims say that the malicious host traffic information goes to a server. They found that the prior art sends it to the gateway, and it's not just in one spot. That's appendix 27 and then 29. They doubled down on it. Halfway down through the page, it again says that Junk discloses that the virus service provides information to the packet security gateway, which they've identified as the edge server. It's the wrong mapping. And so for that basis alone, the factual determinations by the board are inconsistent with the claims, and this decision must be reversed because it does not map to the claims. Thank you. Thank you. Thanks, all counsel. The case is submitted. That completes our business for today. Court is adjourned.